UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
YORKSHIRE TOWERS COMPANY, L.P. and           13 – CV - 1757 (JMF)
YORKSHIRE TOWERS TENANTS ASSOCIATION,

                            Plaintiffs,           ECF Case

      -against-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, RAY LAHOOD, in his capacity
as Secretary of the United States Department of
Transportation, FEDERAL TRANSIT
ADMINISTRATION, PETER M. ROGOFF, in his
capacity as Administrator of the Federal Transit
Administration, METROPOLITAN
TRANSPORTATION AUTHORITY, FERNANDO J.
FERRER, in his capacity as Acting Chairman of the
Metropolitan Transportation Authority, NEW YORK
CITY TRANSIT AUTHORITY, THOMAS F.
PRENDERGAST, JR., in his capacity as the President of
the New York City Transit Authority and
METROPOLITAN TRANSPORTATION AUTHORITY
CAPITAL CONSTRUCTION COMPANY, MICHAEL
HORODNICEANU, in his capacity as President of
the Metropolitan Transportation Authority Capital
Construction Company,

                            Defendants.

--------------------------------------------------------------------x


**DECLARATION OF DORON GOPSTEIN, PRESIDENT
OF THE YORKSHIRE TOWERS TENANTS ASSOCIATION, IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>
(7 of 7)**

Doron Gopstein, declares the following:

1.	I submit this declaration in support of the plaintiffs' motion for a preliminary injunction and in support of the action brought by the plaintiffs.

2.	Yorkshire Towers, located at 305 and 315 East 86th Street in Manhattan between Second and First Avenues and between East 86th and 87th Streets, is the single largest residential building affected by the Second Avenue Subway. Our building, with over 2,000 residents, is a large residential community, including many elderly who have lived here a long time and many younger families with children.

3.	The Yorkshire Towers Tenants Association ("YOTTA") is the voluntary association of these residents and represents and advocates for their concerns both in connection with the larger neighborhood and community of which we are a part, and with the elected officials who represent us and in regard to internal building issues. We appear at community meetings and deal with public and elected officials on matters that affect the interests of the residents, and we provide information and assistance to residents on various issues of concern to them.

4.	I am president of YOTTA and have served in this position for a number of years. In this capacity, I have frequently spoken with our government and elected officials on many issues that affect our residents and our community. In regard to the Second Avenue Subway (the "SAS"), I have attended and participated in all meetings of Community Board 8 and of the Metropolitan Transportation Authority (the "MTA") concerning the SAS in recent years and have spoken with the MTA officials who attend these meetings, as do other community representatives, on entrance location and many other issues related to the construction of the subway.

5.   I have attempted to read or review all publically available MTA documents on the SAS, and have attempted to secure from them additional information on key issues that is not available in these documents, although getting such information from the MTA has not always been successful or easy to achieve. On some important and crucial matters, we have had to expend much time and energy to prepare and file an extensive freedom of information request and, ultimately, commence a freedom of information lawsuit[1] before we were able to get the information from the MTA that we requested–some of which elected officials had also requested without getting a full response to the specific information they had sought.

6.   In my professional life, I was an attorney and previously served in the highest positions in the city's corporation counsel's office under a number of mayors. I believe that the experience of dealing with and helping resolve many complex public issues for the city with multiple, and sometimes competing, public interests has been useful in understanding the larger and smaller issues that have arisen in connection with the SAS. This background and experience has been helpful in better representing our large community organization and its members on an issue that is a small part of this project–the location of an entrance–that has been of concern to this community and in proposing solutions that take into account the different issues and concerns of the MTA and the public. In these efforts, I have served as a community representative, as do other people from different professional backgrounds.

7.   The MTA proposes to build two entrances, one of which is sited midblock, to the future SAS 86th Street station in front of Yorkshire Towers, on the east and west sides of the circular driveway that is in front of our building, despite MTA guidelines that strongly prefer corner entrances because of safety and other transportation reasons. We have proposed to the

---

[1] <u>Yorkshire Towers Company, L.P. and Yorkshire Towers Tenants Association  v. The Federal Transit Administration</u>, S.D.N.Y. Case No. 10 Civ. 8973 (Griesa, J.).

MTA a viable one-entrance solution at the corner of 86th Street and Second Avenue which would significantly reduce the amount of construction and the amount of inconvenience to the community that would result during the long construction period, and which would provide a far safer and more useful entrance during the 100-year projected life of the station. This new proposal, which was not discussed or analyzed previously by the MTA or the FTA and that we believe provides significant environmental advantages for all parties, is described in great detail elsewhere in these papers by the declarations and exhibits of the highly experienced engineers and architects that have developed and analyzed this proposal, and the professional standards and the MTA-stated requirements that apply to such entrances. All of our elected officials (federal, state, and local), who, like us, support construction of the SAS, have supported this one-entrance corner proposal for East 86th Street.

8. I attempted to present this proposal to the MTA and to have the MTA (before it made a decision) fully consider the plan after a full meeting and an exchange of questions and analysis between our engineers and architects and the MTA's professional team, and to have the MTA explain any decision it would make in a full and detailed writing. Unfortunately, the MTA has not engaged in such a process. I present below a chronology of the efforts I made, on behalf of YOTTA and the building, to have the MTA take a full and thorough look at this proposal, and the MTA's response to the submissions of our engineers and architect.

9. At the end of November 2011, I attended a public meeting conducted by the MTA on the SAS. At that meeting I spoke with Michael Horodniceanu, the President of the Metropolitan Transit Authority Construction Corporation (the "MTACC") since 2008, who made some remarks at the meeting. I told him that our professional engineers and architects have devised a plan for a three-escalator entrance at the northeast corner of East 86th Street in front of

3

our building (instead of the two-entrance midblock scheme) that they believe can be done, within schedule and budget, and which would entail less construction and inconvenience for the community during construction and a safer, more useful and more convenient entrance for the entrance's decades of expected use. I said that I thought we could demonstrate that this would have advantages both for the MTA and the community and that it would be useful for us to discuss this further. Dr. Horodniceanu agreed to schedule a meeting.

10. I called Dr. Horodniceanu's office shortly after to schedule this meeting and it was scheduled for January 5, 2012.

11. On January 5, I met Dr. Horodniceanu at his office and presented the one-entrance proposal designed and analyzed by our experts. He asked who our experts were. I told him that our chief architect was Edward Cohen. Dr. Horodniceanu said that he knew him from the time they both worked in the New York City Department of Transportation in the late 1980s. I told him that since then, Mr. Cohen had served with the MTA as the chief architect for all the entrances and ancillary facilities for the SAS and that he had also helped draft the MTA's new guidelines for station entrances. I told him that our transportation engineer and expert on passenger flow, passenger convenience, and all related issues of projecting and analyzing pedestrian movement, convenience and crowding was Dr. Jerome Lutin, a leading and nationally known authority in the field with over forty years' experience who has contributed many published articles. Dr. Horodniceanu said that he knew of Dr. Lutin. I briefly mentioned our two other engineering experts: our civil engineer, Peter S. Schneidkraut, and our geotechnical and underground engineer, Ingo H.R. Fox, both with over 30 years' experience.

12. I described the basic outlines of the One-Entrance, Corner Solution that is described in greater detail in the exhibits attached to this declaration and in the declarations of

our experts. I gave Dr. Horodniceanu preliminary design and conceptual drawings that Mr. Cohen prepared, illustrating the one-entrance proposal. The drawings are attached collectively as Exhibit 4.

13. I explained that the MTA had stated in the past, both in its public writings and in answers at public meetings, that the reason it believed it could not build the 86th Street entrance at the corner of 86th Street was because the MTA assumed that it needed three escalators to accommodate the people who it thought would be coming to that entrance from the east and that it believed there was not enough room on the sidewalk to accommodate three escalators.

14. Our experts, I stated, had found a way to provide that extra space which the MTA had not discussed in any of its public environmental analyses. I explained that there were a number of design and other changes which Mr. Cohen concluded would provide the extra necessary space for three escalators and that the main one would be the utilization of an over five foot planter area running east-west that is within Yorkshire Towers' building line and which could be made part of the sidewalk. Our experts have concluded that the building of one entrance at the corner, instead of two entrances spreading out to midblock, would result in significantly less costs and construction time, as well as less inconvenience to the community, would be more convenient and safer for passengers and for pedestrians, and less expensive for the MTA to operate over the next 100 years.

15. Dr. Horodniceau looked at the illustrative drawings that Mr. Cohen had prepared. He mentioned that acquisition can be a big problem and can take time. He then asked me, would the building provide the MTA with a surface easement in perpetuity for the planter area? I said that it would, but since that was a key question and would obviously eliminate the time necessary for going through a building acquisition process, I would check again and get back to him

5

immediately with an answer. I did that and confirmed (in the January 9 email that I sent him, described below) that the permanent surface easement would be voluntarily provided to the MTA by our building.

16. He also said that he thought the Two-Entrance, Midblock Scheme might be better for passenger convenience than the corner entrance. He said that his client was New York City Transit (the part of the MTA that operates the subways), that they study passenger convenience, and that they say or would probably say that their plan is better for passenger convenience. I said that our transportation expert, Dr. Lutin, had analyzed the problem carefully and technically and concluded that the corner entrance was as good as or better than the Two-Entrance, Midblock Scheme in regard to passenger convenience and other key transportation concerns, and I would provide him Dr. Lutin's analysis.

17. I stressed that although I was summarizing our experts' analyses and proposals, the important thing, of course, was for our experts to present this plan directly to him and his technical advisors, to know and to hear what questions his technical advisors might have once they study the one-entrance, corner plans carefully so that we know which professional and technical findings of our experts they agree or disagree with, the basis of such views, and an opportunity to respond and clarify. I thought the most important step at that point was to schedule a follow-up meeting with Mr. Cohen, our lead architect who designed the plan. Dr. Horodniceanu agreed and asked me to call and schedule that meeting with him. We both agreed it was better to do it sooner rather than later. Our meeting was personally cordial and he and I have maintained a cordial relationship, although as submitted in the accompanying papers, we believe that the MTA has not fulfilled its obligations in its response to our detailed, new information.

6

18. Within the next few days I called Dr. Horodniceanu's office twice to set up the meeting at the earliest possible point. His administrative assistant emailed me back on January 17, 2012 saying that he could have that meeting on February 6 at 4 pm and Dr. Horodniceanu emailed me on January 18 asking me to invite Mr. Cohen or send him his email. I did both in an email I sent to Mr. Dr. Horodniceanu the same day. Copies of the January 17 and 18 emails are attached collectively as Exhibit 51.

19. In the meanwhile, to follow-up on our January 5 meeting and to help prepare for the February 6 meeting, I sent Dr. Horodniceanu an email on January 9 in regard to some of the key issues we had discussed. A copy of the January 9 email is attached as Exhibit 52.

20. In regard to Dr. Horodniceanu's question whether the building would provide the MTA a permanent easement for the planter area that is within Yorkshire Towers' building line, I wrote back that I had reconfirmed that the answer was yes, as follows:

> In regard to your question about an easement, I've talked to the building owners' representative again and have reconfirmed that the easement for the additional five feet on East 86th Street that is within the building line, and that would be added to the available sidewalk, will be available to the MTA as part of a voluntary process between the MTA and the building. There is no necessity for any time-consuming contested condemnation or easement.

21. In regard to Mr. Cohen, I wrote about his availability to explain his plan in greater detail and that he is completing additional illustrative subsurface drawings to illustrate in more detail the reduced construction that he states would result under his plan. I wrote:

> I've talked to Ed Cohen. He is available for the meeting that we discussed at any time to explain in further detail his proposal, illustrative drawings and outline points for the three-escalator entrance at the northeast corner of 86th Street. He is also completing additional illustrative subsurface drawings which I will provide to illustrate in more detail the reduced construction that he believes would result under this plan. (I believe he'll be away for about two weeks starting on Jan. 18). As I mentioned, Ed was the chief architect for the Second Avenue Subway for all entrances and

ancillary facilities and helped prepare the MTA/NYCTransit "Planning and Design Guidelines for New Underground Stations" (2004).

22. In regard to Dr. Lutin, I briefly summarized his extensive qualifications as a leading transportation expert and restated his conclusion that the three-escalator, corner entrance proposal meets all professional requirements for passenger convenience and will at least meet or exceed standards of passenger convenience compared to the Two-Entrance, Midblock Scheme. I also stated that Dr. Lutin is completing the report that states the professional basis for those findings:

> As I mentioned, Dr. Jerome Lutin, who is our transportation engineering expert consultant, has reviewed the proposed three escalator entrance proposal and concluded that this entrance would meet all the standards and considerations of passenger convenience that are professionally required and that are included in the MTA's standards in its previous analyses for the midblock entrances as reflected in the documents that were made available to us in the freedom of information process. He has concluded that the level of passenger convenience for the proposed corner entrance will at least meet that of the midblock entrances. He is completing a report that presents the professional basis of these findings and conclusions and which I will present to you. Dr. Lutin has 40 years' experience as one of the country's leading transportation and planning experts working in both the private and public areas, He is a professional engineer and a professional planner, has written over 40 refereed journal articles, has consulted for both the New Jersey Transit and the Federal Transit Administration and taught for ten years at Princeton University.

23. In further preparation for the meeting that was to be scheduled with our lead architect and planner, Mr. Cohen, I had hand-delivered to Dr. Horodniceanu on January 12 a letter (dated January 11, 2012) with the additional professional studies by Mr. Cohen and Dr. Lutin that I had referred to.

24. Mr. Cohen prepared two additional illustrative concept drawings collectively attached as Exhibit 5, which I gave Dr. Horodniceanu and described as follows:

> Ed Cohen, the former chief architect for the Second Avenue Subway entrances and ancillary facilities, has prepared two additional drawings

8

(dated 1/9/12) titled "86th St. Station Entrance Concept Context Plan" and "86th St. Station Cut-Cover Excavation Area Comparison Analysis." The first provides greater detail that helps further explain how this proposal meets required pedestrian flow and queuing level of service. The second demonstrates the reduced construction and excavation area that would be required under this proposal compared to Alternative 7.

25.     I also provided Dr. Horodniceanu with the two reports prepared by Dr. Lutin which I explained were forthcoming in my January 9 email. The first report ("Street Level Analysis of Pedestrian LOS") gave the specific technical calculations and basis upon which Dr. Lutin had arrived at his conclusions. A copy of the first report is attached as Exhibit 43. The second report ("Transportation Planning Analysis") more broadly describes Dr. Lutin's conclusions on the professional transportation benefits of the one-entrance corner plan. I described the two reports as follows:

> Dr. Jerome M. Lutin, the transportation engineer and planner with 40 years' experience, has prepared two documents (dated 1/10/12).
>
> (1) The first, titled "Street Level Analysis of Pedestrian LOS" (3 pages), deals with passenger convenience. It incorporates the standards and information contained in the MTA's FEIS and the MTA's SEA for the Second Avenue Subway and the CEQR Technical Manual. It provides the detailed engineering calculations that are the basis of his conclusion that the proposed three-escalator corner entrance meets or exceeds LOS requirements and meets or exceeds the level expected to be achieved by the MTA in its two-entrance plan.
>
> (2) The second, titled "Transportation Planning Analysis" (3 pages), "discusses the transportation benefits of the [three-escalator] proposal in terms of passenger convenience, traffic, safety, security, construction costs, construction impacts, and operational savings." Dr. Lutin states in the introduction that, in addition to the many benefits to the MTA and the public summarized in the report, "The proposed plan meets all of the MTA's stated goals and objectives for subway entrances and satisfies the minimum requirements in the Supplemental Environmental Assessment (SEA) for alternatives to the 'No Action' alternative."
>
> A copy of the second report is attached as Exhibit 42.

26.     I concluded our January 11 letter to Dr. Horodniceanu stating as follows:

> It would appear from their professional analysis that the one entrance three-escalator corner proposal has many benefits for the MTA and the public and the community, and can be achieved within budget and time constraints. I look forward to further discussion so that this can be resolved as quickly as possible. Thanks for your time and attention.

27. Following these January 9 and January 12 additional submissions to the MTA, our experts prepared further for the February 6 meeting with Dr. Horodniceanu so that they would be in a position to answer any technical and professional questions that Dr. Horodniceanu and his technical advisors might have.

28. Since, at this point, Dr. Lutin was not scheduled to attend the February 6 meeting with Mr. Cohen, I made it clear to Dr. Horodniceanu in my January 11 letter if he or his staff had any possible question concerning Dr. Lutin's calculations, analysis or conclusions, Dr. Lutin was of course available to answer them:

> Dr. Lutin is also available to answer any question you may have concerning his technical calculations and conclusions or explain any other items in his analysis concerning the LOS and other issues.

29. On Monday, February 6, Mr. Cohen and I were prepared to meet Dr. Horodniceanu and his technical staff at 4 p.m. Mr. Cohen and I arranged to meet earlier to go over once again any questions which we anticipated Dr. Horodniceanu and his technical advisors might have.

30. Early in the morning, I received an email from Dr. Horodniceanu asking again to please invite Mr. Cohen.

31. This email was also copied to Mr. William Goodrich, an engineer and the Senior Vice President overseeing the SAS.

32. I called Dr. Horodniceanu's administrative assistant in the morning to confirm the time and place and was told everything was in place for our 4 p.m. meeting. In the afternoon, I

received a call from Dr. Horodniceanu's office and was told the meeting was cancelled because Mr. Horodniceanu has a meeting with the chairman. I received a second email from his office at 12:25 p.m. stating: "Canceled: Meeting w/ Doron Gopstein & Ed Cohen." (Copies of the two emails of February 6, 2012 that I received from his office are attached collectively as Exhibit 53. When his office called to cancel, I asked when we can reschedule the meeting since it was important to hold it as soon as possible. I was told there was no date at that point.

33.  Two days later, on Wednesday, February 8, I called Dr. Horodniceanu's office again trying to reschedule the meeting with Mr. Cohen. I asked to speak to Mr. Horodniceanu. I instead spoke to an assistant. I explained that I was trying to reschedule the February 6 meeting, that it involved construction, and that Dr. Horodniceanu had said he wanted it held sooner than later and that we will make ourselves available at any time convenient to Dr. Horodniceanu, including evenings and weekends. She said she had written down all of what I said and would forward it.

34.  On Monday, February 13, I called again and essentially gave the same information to the same assistant, who said she will give it to Barbara Cisek, Dr. Horodniceanu's administrative assistant.

35.  Not having heard back, I called again on Tuesday, February 14 and spoke to Ms. Cisek, She said Mr. Horodniceanu was in Albany and is leaving for Europe on Friday, February 17, and that he will be back on Saturday, February 25.

36.  I heard nothing from Dr. Horodniceanu's office from Monday, February 27 through Friday, March 2 concerning rescheduling the meeting that Dr. Horodniceanu agreed two months earlier should be held. I therefore wrote an email to Dr. Horodniceanu on Sunday, March 4, urging him to reschedule at his earliest convenience and that we will make ourselves available

11

at any time. A copy of the March 4 email is attached as Exhibit 54. I included for reference my two earlier letters, dated January 9 and January 11, and reminded him that we had answered his question that a permanent easement would be provided to the MTA for the planter area. I reconfirmed Ed Cohen's firm's professional conclusion, following years of planning the City's subway entrances for the MTA, that the One-Entrance, Corner Solution will provide many benefits to the MTA and the community and can be done within time and budget constraints. I wrote as follows:

> I met with Ed a few days ago and he restated again the details of the one entrance, three-escalator corner plan. At our rescheduled meeting with you he will of course be ready to answer any technical questions that you may have. He continues to be very firm in his conclusions, based on many years of planning subway entrances for the MTA, including as chief architect for the Second Avenue Subway entrances and ancillary facilities, that the one entrance corner plan will provide many major and important advantages to the MTA and to the community--both during the MTACC's construction period and, just as important, permanently for decades afterwards--over the two entrance plan, and that it can be done within time and cost constraints.

37. I stated that I would call his office again the next day to reschedule at whatever time was convenient for him.

38. On Monday, March 5, I called Dr. Horodniceanu's office again and spoke with Ms. Cisek. I sought to reschedule, emphasizing the importance of doing it quickly for all the reasons stated above. She said she would convey the message.

39. On Tuesday, March 6, I received an email from Mr. Horodniceanu stating that he could not meet with Mr. Cohen and me, because I was an attorney, and, in order to follow "proper protocol," all communications should be with the MTA's lawyers. A copy of the March 6 email is attached as Exhibit 55. He also wrote that he was "advised" that the MTA "considered

and rejected this proposal…for both technical and schedule reasons" in the context of an earlier litigation not having to do with this northeast corner, three-escalator proposal.

40. There appears to be no way the MTA could have, prior to my meeting with Dr. Horodniceanu on January 5, thoroughly considered "this proposal" that I discussed with Dr. Horodniceanu on January 5 and amplified through detailed technical and engineering submissions provided by Mr. Cohen and Dr. Lutin after that meeting, and with answers we provided after January 5 to questions that he asked and issues that he raised at our January 5 meeting. In any event, the MTA had never provided to us any writing reflecting this prior decision and the specific reasons and analysis for it.

41. On January 5, Dr. Horodniceanu said that he thought that the NYC Transit staff was concerned about passenger convenience. Dr. Lutin's professional, detailed analysis after January 5 concluded that this MTA concern was professionally inaccurate and unfounded based on his calculations and analysis of professional requirements and standards. In addition, Dr. Horodniceanu asked me on January 5 whether Yorkshire Towers would provide a permanent easement for the critical planter area, and I subsequently gave him an affirmative answer.

42. None of this information and analysis was available to the MTA technical staff or requested by the MTA staff when they allegedly previously rejected "this proposal…for technical…reasons." And, if they had made such a rejection, it was done without holding any meetings or discussions with our technical experts, with no questions directed at our experts orally or in writing, and with no written explanation of the issues and alternatives they had considered that led to their rejection, supposedly for "technical and scheduling reasons," of the proposal presented and amplified in January.

43. The belated statement by the MTA, that it was somehow inappropriate to discuss Yorkshire Towers' proposal with the president of the Yorkshire Towers residents association because he happens to be (in other roles) an attorney, is disingenuous and simply misguided. The reason that so many people who are lawyers or have a legal background are active in civic activities and give freely of their time in heading civic or community groups–as I have done here–is precisely because the general skills that lawyers have are helpful and desirable for all organizations.

44. Those basic skills–reading materials carefully, not being intimidated by documents hundreds of pages long that may sometimes hide more than they reveal, being able to ask specific and clear questions and following up when the answers deal with none or only some of the issues posed, listening carefully and following up on issues–are exactly what can make a community organization more effective in dealing with powerful governmental bodies with vastly greater resources. It is obviously one of the reasons that the residents of our building and of many other civic groups consider it useful and logical to have someone who is likely to possess such skills and such an approach heading their organization. This kind of community service by lawyers is a great source of strength for our public and communal life and should be valued and encouraged, rather than used as a belated and disingenuous basis for canceling the meeting and not dealing further with the president of the residents' association on this issue.

45. In any event, I had made it clear, initially, to Dr. Horodniceanu that I was approaching him as president of the residents' association and not as an attorney and that I would like to have a meeting with him to pursue the One-Entrance, Corner Solution, which I thought could be mutually beneficial, and not to pursue any legal issues. He was fully aware that, in

addition to being the president of YOTTA, I was an attorney with many years of prior public legal service at the highest levels.

46.     The MTA's March 6 response caused unnecessary delay in trying to move this issue forward and forced us to unnecessarily seek attorneys' time and resources, the same occurrence that happened previously when the MTA forced us to make a detailed request under the Freedom of Information Act, and then bring a lawsuit when they did not adequately reply, before they finally provided us with some requested information about their plans.

47.     In light of the MTA's March 6 response, we went again to our congresswoman, Carolyn Maloney, who has helped the MTA receive over $1.3 billion for the SAS, and our other elected officials. Unlike the MTA, they met with our technical team and listened to their detailed presentation. Following that, Representative Maloney wrote a letter to Dr. Horodniceanu, dated April 5, 2012 (Representative Maloney's letter is attached as Exhibit 7 which encloses the summary of key points, dated February 15, 2012, by Mr. Cohen of the many specific benefits of the northeast corner entrance plan), strongly supporting the proposal and asking the MTA to take the following steps in order to fully inform themselves of the plan, as she had done.

48.     More specifically, Representative Maloney wrote: "I urge you and members of your technical staff to meet with Mr. Cohen and his technical team, community representatives, and my office, to take a serious look at his solution. I am persuaded that this would be a 'win-win' for the community and the MTA." The other state and city elected officials wrote a similar letter, dated April 16, 2012, to MTA's then-Chairman Joseph Lhota expressing a similar position. A copy of the April 16, 2012 letter is attached as Exhibit 8.

49.     By letter dated April 18, 2012, Dr. Horodniceanu wrote back to Representative Maloney and rejected the One-Entrance, Corner Solution, without ever having had a meeting

15

with Mr. Cohen, Dr. Lutin or any of our technical experts, and without ever having asked them any questions about their detailed submissions demonstrating and concluding that the proposal was technically feasibility, had distinct advantages for passenger convenience and for numerous other key public needs and could be accomplished within time and budget concerns.  In its April 18, 2012 letter, rejecting the one-entrance corner proposal, the MTA restated some findings and conclusions it had made in its 2009 environmental analysis but did not provide a detailed and specific statement explaining exactly where and how they disagreed with our experts' detailed and highly important new information and calculations and what, if any alternatives, they had considered. It appears that, in regard to such new and significant information, the MTA's April 18 letter provided only conclusory rejections without providing any detail and specificity on where they disagreed with our experts' detailed submissions.

50. Dr. Horodniceanu wrote to Representative Maloney that "it no longer makes sense for the MTA to consider new design proposals." He said, "Mr. Cohen's proposal does not appear to be a viable option" and that "both cost and time impacts prevent the MTA from considering new proposals at this time." Dr. Horodniceanu concluded, "further consideration of Mr. Cohen's proposal is simply not an option for the MTA."

51. Although the MTA held a later meeting with our experts in June, they have yet to provide any writing explaining, with any specificity, where the detailed information, analysis and conclusion provided by our professional experts is wrong, or the specific basis of any disagreements that they may have with those submissions. Nor has the Federal Transit Administration provided any written response or analysis following a meeting with our professional technical experts in August described by other declarations being submitted.

52. Having the construction of a future subway at our doorstep for years is a source of enormous disruption to the daily lives of our over 2,000 residents. The noise, dust, hours of drilling, dynamite explosions, closed off sidewalks–all these are and will be great disruptions. We are not asking to put these huge problems in front of some other building. We are not asking to put even a fraction of this disruption at the doorsteps of future passengers who live blocks away (who experience not a second of discomfort through the years of construction, yet whose future "passenger convenience"–walking a few extra feet—is considered paramount by the MTA). The construction under the One-Entrance, Corner Solution will all take place in front of our building.

[The Balance of This Page is Intentionally Left Blank]

53. However, where a detailed proposal by leading engineers and architects provides new and important information that can reduce the amount of such construction and provide great safety, environmental and transportation benefits, temporarily and permanently, compared to the MTA's Two-Entrance, Midblock Scheme, the many details and calculations of the one-entrance proposal require, at a minimum, full technical and professional analysis by the MTA and the FTA and a detailed written explanation by them of the basis of any action that they take in response to such new, significant and detailed submissions. The history described above shows that such an analysis and explanation by the MTA and the FTA has not taken place. We submit that unless the court issues injunctive relief, much unnecessary work and great disruption to the lives of our residents and our community will take place, and many very significant benefits that would result from the One-Entrance, Corner Solution would be permanently lost.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on February 27, 2013

_Doron Gopstein_